# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 72360-0-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| LONZO WILLIAM LAWSON II, | |
| Appellant. | FILED: December 8, 2014 |

APPELWICK, J. — Lawson challenges his conviction for first degree burglary and the calculation of his offender score. He argues that there was insufficient evidence that he was armed with a deadly weapon for the purposes of his burglary charge. He asserts that the trial court erred in finding that his two counts of trafficking in stolen property were separate criminal conduct. He contends that his trial counsel was ineffective for failing to argue that his two counts of possession of a controlled substance constituted the same criminal conduct. We vacate the finding that he was armed with a deadly weapon. We reverse the finding that the two counts of trafficking were separate criminal conduct. We remand for resentencing.

## FACTS

Gena Allen owns and operates Frosty's Saloon and Grill in Napavine, Washington. There are three entrances to Frosty's. The front door opens to Front Street. The back door opens to Highway 603. There is also a set of French doors that opens to the beer garden, which is enclosed by a fence.

Allen has an office inside Frosty's, where she keeps supplies and does her bookkeeping. The office is open to employees during the day and is locked at night. There is a safe inside the office, where Allen often keeps a large amount of cash. Only

select employees were given the combination to the safe. Allen also wrote the combination under a shelf directly above the safe. The safe did not always lock properly. Frosty's did not have a security system on April 8, 2013.

Christopher Carsten has been a Frosty's employee for four years. Starting in January 2013, he spent about two months in jail for attempting to elude a police vehicle. For roughly half of Carsten's incarceration, he was housed in the same unit as the appellant in this case, Lonzo Lawson. During that time, Carsten told Lawson about the lack of security system at Frosty's, the location of the safe, and the fact that there was money in the safe.

On the evening of April 8, 2013, Lawson was with Kevin Dawkins and Thomas Pennypacker at Dawkins' house in Chehalis. Lawson told Dawkins and Pennypacker what he learned about Frosty's and how easy it would be to steal the cash stored in the office. Pennypacker initially volunteered to be a lookout for Lawson, but decided against it. Lawson left on his bicycle late that night, sometime around 11:00 p.m. or midnight. Pennypacker and Dawkins stayed at Dawkins' house.

Julie Canedo was the closer at Frosty's that night. She worked from 5:00 p.m. until midnight. Toward the end of her shift, she received a phone call at Frosty's. The caller was a male who asked if she was closed. She replied, "Yes, I am." The caller said, "Closed, huh?" and hung up.

Before leaving, Canedo checked the French doors that led to the beer garden. The glass panes were intact and the doors were locked. She put the cash till in the office and locked the office door. The office door was not broken or damaged when she left. She exited out the roadside door and locked it with a padlock.

2

Janice Ham opened Frosty's the next morning. She arrived between 6:00 and 6:30 a.m. She entered through the highway-side door. When she walked into the kitchen, she saw a hat on the floor and an open drawer. The open drawer held kitchen utensils, including cooking knives. Ham initially thought the evening workers had just left a mess. However, Ham soon noticed broken glass on the floor by the French doors. She also saw that the office door was open, there were papers all over the floor, and there was a knife and spatula on the floor. Ham became frightened and went outside to call the police.

Officer David Elwood of the Napavine Police Department responded to the scene at around 8:00 a.m. He observed that the French doors and the office door had signs of forced entry. A chef's knife lay broken on the floor outside the office. There was a steak knife inside the office. The knife had a pronounced bend in the blade. Officer Elwood collected the hat, the chef's knife handle, and the steak knife as evidence. Allen determined that $14,797 in cash was missing from the safe.

Meanwhile, Lawson returned to Dawkins' house at around 8:00 or 8:30 a.m. Lawson had a "bunch of cash" that he said he got from the safe at Frosty's. He gave Dawkins and Pennypacker each $2,000. He kept the rest for himself.

The men went shopping and bought food, heroin, clothes, and other items. At around midnight, Lawson and Pennypacker went to the Lucky Eagle Casino and gambled. They returned to Chehalis early on the morning of April 10. Lawson rented a room at the Chehalis Inn.

Lawson soon became a suspect in the Frosty's burglary. Officer Elwood spoke to Pennypacker and Dawkins, who implicated Lawson. On the evening of April 11, Officer Elwood and Detective Bruce Kimsey contacted Lawson at the Chehalis Inn. Lawson

3

claimed that he did not commit the burglary and instead blamed Dawkins and Pennypacker. There were several items in Lawson's room that appeared to have been recently purchased, such as a laptop computer and clothing. Officers also found a box containing $1,512 in cash, as well as drug paraphernalia and bags containing methamphetamine and heroin.

Officer Elwood arrested Lawson that evening. Subsequent tests revealed that Lawson's DNA (deoxyribonucleic acid) matched the sample located on the hat found in the kitchen and the knife handle found on the floor next to the office door.

The State charged Lawson with count I: burglary in the first degree; count II: theft in the first degree; counts III and IV: trafficking in stolen property in the first degree; count V: possession of a controlled substance – heroin; and count VI: possession of a controlled substance – methamphetamine.

The jury found Lawson guilty as charged. It also found by special verdict form that Lawson was armed with a deadly weapon at the time of committing first degree burglary.

Lawson was sentenced to 104 months confinement. He appeals.

## DISCUSSION

Lawson argues that there was insufficient evidence that he was armed with a deadly weapon for the purpose of committing first degree burglary. He also asserts that the trial court erred in calculating his offender score, because it determined that his two counts of trafficking in stolen property constituted separate criminal conduct. He further contends that his trial counsel was ineffective for failing to argue that his convictions for possession of a controlled substance constituted same criminal conduct.

4

I.    Sufficient Evidence of a Deadly Weapon

Lawson argues that the State failed to prove that he was armed with a deadly weapon for the purposes of his first degree burglary charge. He maintains that there is no evidence that he used, attempted to use, or threatened to use the knife as a deadly weapon.

Evidence is sufficient to support a conviction where, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In re Pers. Restraint of Martinez, 171 Wn.2d 354, 364, 256 P.3d 277 (2011). When an appellant challenges the sufficiency of the evidence, he admits the truth of the State's evidence and all inferences that can reasonably be drawn therefrom. Id. This is a deferential standard and we leave questions of credibility, persuasiveness, and conflicting testimony to the jury. Id.

First degree burglary requires the State to prove, among other elements, that the defendant was armed with a deadly weapon or assaulted another person. RCW 9A.52.020(1). A "deadly weapon" for purposes of this crime means

> any explosive or loaded or unloaded firearm, and shall include any other weapon, device, instrument, article, or substance, including a "vehicle" as defined in this section, which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm.

RCW 9A.04.110(6). Where the weapon in question is neither a firearm nor an explosive, its status as a deadly weapon "rests on the manner in which it is used, attempted to be used, or threatened to be used." Martinez, 171 Wn.2d at 366. The surrounding circumstances may inform whether the apparatus, as used, constituted a deadly weapon.

5

See, e.g., State v. Skenandore, 99 Wn. App. 494, 500, 994 P.2d 291 (2000); State v. Shilling, 77 Wn. App. 166, 172, 889 P.2d 948 (1995).

The alleged deadly weapons in this case are two knives: a chef's knife with a nine and one-half inch blade and a steak knife with a four inch blade. Because these weapons are not per se deadly under the statute, the State was required to prove that Lawson used, attempted to use, or threatened to use one or both of the knives in a manner readily capable of causing death or substantial bodily harm. See id.; RCW 9A.04.110(6).

The evidence here is as follows: Lawson did not arrive with the knives. He took them out of the Frosty's kitchen drawer. He carried them from the kitchen to the office, about 40 feet away. He used one or both knives to pry open the office door. Lawson did not take the knives with him. He left the broken chef's knife on the floor outside the office door. The bent steak knife was inside the office on the desk. There is no evidence that Lawson encountered anyone, nor that anyone else was inside the restaurant at the time.

At trial, the State relied on State v. Gamboa, 137 Wn. App. 650, 154 P.3d 312 (2007), to argue that Lawson was armed with a deadly weapon. In that case, Division Three held that a machete used to forcibly enter a home was a deadly weapon, despite the lack of evidence that it was used or intended to be used as a weapon. See id. at 651, 653. The court reasoned that it is

> the potential as a weapon and not how the machete was actually used that is important. . . . It was not necessary for the homeowners to appear and for Mr. Gamboa to brandish the machete for it to qualify as a deadly weapon. A machete is readily capable of causing great harm by its very nature and size.

Id. at 653.

The Washington Supreme Court subsequently disapproved of Gamboa. See Martinez, 171 Wn.2d at 368 n.6. The Martinez court stated that, "[b]y characterizing a machete as a deadly weapon on the sole basis of its dangerousness and without regard to its actual, attempted, or threatened use, the Gamboa court essentially read the circumstances provision out of the statute and treated the machete as if it were a deadly weapon per se." Id. The court thus concluded that a weapon's potential for harm is alone insufficient for a deadly weapon finding under the statute. See id.

Under this reasoning, the court reversed Martinez's deadly weapon finding. See id. at 368-69. There, Deputy Joseph Wester responded to a burglar alarm at an uninhabited farm shop and found Martinez stepping out of the building. Id. at 357-58. Martinez immediately fled. Id. at 358. Deputy Wester chased Martinez and tackled him to the ground. Id. After handcuffing Martinez, the deputy noticed that Martinez had an empty knife sheath on his belt. Id. Officers later retraced Martinez's path of flight and found a knife in the mud, about 15 feet from the farm shop. Id. Martinez identified the knife as his own. Id. The court noted that "[n]o one saw Mr. Martinez with the knife, and he manifested no intent to use it. Furthermore, no one saw Mr. Martinez reach for the knife at any time after he was apprehended." Id. at 368. It found that the evidence did not support a deadly weapon finding. Id. at 369.

By contrast, in State v. Gotcher, 52 Wn. App. 350, 356-57, 759 P.2d 1216 (1988), we upheld a deadly weapon finding where the evidence showed that the defendant reached for his switchblade upon encountering police. We held that "there must be some manifestation of willingness to use the knife before it can be found to be a deadly weapon

under RCW 9A.04.110(6)." Id. at 354. We found the evidence sufficient to establish Gotcher's willingness to use the switchblade. See id. at 356-57.

Lawson asserts that here, there is no evidence indicating a willingness to use either knife as anything other than a tool to access the office. We agree. The evidence shows that Lawson carried the knives to the office and used one or both of them to break into it. But, unlike in Gotcher, there is no evidence that Lawson used, attempted to use, or threatened to use the knives in an aggressive way against another person.

The State maintains that there was circumstantial evidence sufficient to support a deadly weapon finding. It urges us to believe that Lawson did not know if anyone else was in the building and had no reason to carry the knife "other than to have the knife available to use against a person who may be therein." However, an apparatus does not become a deadly weapon simply because it could have harmed someone had they been present. See Martinez, 171 Wn.2d at 368 n.6.

Skenandore illustrates this point. 99 Wn. App. at 496. There, Division Two reversed a deadly weapon finding where Skenandore attacked a corrections officer with a homemade spear. Id. The spear was "two-and-one-half feet to three feet long, fashioned from writing paper rolled into a rigid shaft bound with dental floss, affixed to a golf pencil." Id. The court noted that, under some circumstances, the pencil spear might be shown to be a deadly weapon. Id. at 500. For example, the spear could have inflicted serious bodily harm had it pierced the officer's eyes. Id. But, from where Skenandore was standing, he was unable to reach the officer's head with the spear. Id. Thus, "the surrounding circumstances inhibited the spear's otherwise potential, but unproven, ready capability to inflict substantial bodily harm." Id.

8

Here, the surrounding circumstances likewise inhibited the potential to inflict harm. No one else was present when Lawson possessed the knives. They were therefore capable of causing substantial bodily harm or death only by virtue of their nature and size. Martinez makes clear that this is not enough. See 171 Wn.2d at 368 n.6. We find the evidence here insufficient to lead a rational trier of fact to find the deadly weapon element beyond a reasonable doubt. We vacate the finding that Lawson was armed with a deadly weapon.

As a result of the jury's deadly weapon finding, Lawson's conviction was elevated from second degree burglary to first degree burglary and the court imposed a two year sentencing enhancement. Remand for resentencing on a lesser included offense is appropriate only if the jury was explicitly instructed on the lesser offense. State v. Green, 94 Wn.2d 216, 234, 616 P.2d 628 (1980); In re the Pers. Restraint of Heidari, 174 Wn.2d 288, 292-93, 274 P.3d 366 (2012). "Based upon the giving of such an instruction it has been held that the jury necessarily had to have disposed of the elements of the lesser included offense to have reached the verdict on the greater offense." Id. (emphasis omitted). Here, the jury was instructed on the lesser included offense of second degree burglary.

We remand for resentencing on the lesser included offense of second degree burglary and to strike the deadly weapon sentencing enhancement.

II.    Same Criminal Conduct

Lawson contends that the trial court erred in counting his two convictions for trafficking in stolen property as separate criminal conduct.

9

When sentencing a defendant to two or more current offenses, the trial court determines the sentence range for each current offense by using all other current and prior convictions for the purpose of the offender score. RCW 9.94A.589(1)(a). If the trial court finds that multiple current offenses encompass the same criminal conduct, those current offenses are counted as one crime. Id. Separate offenses constitute the same criminal conduct if they (1) have the same criminal intent, (2) are committed at the same time and place, and (3) involve the same victim. RCW 9.94A.589(1)(a); State v. Porter, 133 Wn.2d 177, 181, 942 P.2d 974 (1997). We review a trial court's determination of what constitutes the same criminal conduct for abuse of discretion and misapplication of the law. State v. Vanoli, 86 Wn. App. 643, 650, 937 P.2d 1166 (1997)

The State charged Lawson with two counts of trafficking, one for his delivery of $2,000 to Pennypacker and one for his delivery of $2,000 to Dawson. Lawson maintains that these offenses constituted the same criminal conduct. He relies on Porter, which states that "there is one clear category of cases where two crimes will encompass the same criminal conduct—'the repeated commission of the same crime against the same victim over a short period of time.'" 133 Wn.2d at 181 (quoting 13A SETH AARON FINE, WASHINGTON PRACTICE § 2810, AT 112 (Supp. 1996))). Porter sold two different controlled substances to the same person in quick succession. Id. at 185-86. The victim of each sale was the State. Id. at 181. The court found that Porter's intent remained the same throughout: "[H]er intent, objectively viewed, was to sell both drugs in the present as part of an ongoing transaction." Id. at 185-86.

The State agrees that Lawson's offenses involved the same time and place and the same victim. However, at sentencing, the State cited Vanoli to argue that Lawson's

10

criminal intent was different for each transaction and thus Lawson's two trafficking offenses were separate criminal conduct. The trial court agreed that, under Vanoli, the offenses counted as separate criminal conduct, because Lawson delivered the stolen property to two different people.

Vanoli was convicted of three counts of delivering lysergic acid diethylamide (LSD) to minors within 1000 feet of a designated school bus stop. 86 Wn. App. at 645. The buyers entered the room one at a time over the span of a few minutes, purchased the LSD, and then left the room. Id. at 650. Vanoli argued that the three transactions constituted the same criminal conduct, because "successive deliveries of exactly the same drug at the same time and place necessarily involve the same criminal objective— the sale of that drug." Id. at 650. We disagreed. Id. at 651. Because Vanoli conducted three separate transactions with three separate buyers, we reasoned that each had a separate criminal objective. Id. We further noted that, by virtue of the age enhancement statute for sale of controlled substances,[1] the legislature recognized minors as victims of a drug transaction. Id. at 651-52. We found that, "[b]ecause Vanoli delivered to three different persons, thus victimizing the public on three distinct occasions, and for the additional reason that those three persons were all minors, and thus victims in their own right, Vanoli's crimes did not involve the same criminal conduct." Id. at 652.

The State relies on Vanoli for the proposition that transactions with separate persons necessarily lead to separate criminal objectives. See id. at 651. However, Porter indicates that Vanoli was wrongly decided on that point. Porter established that criminal intent remains the same throughout separate transactions if those transactions are part

---

[1] RCW 69.50.406.

11

of a "continuing, uninterrupted sequence of conduct." 133 Wn.2d at 186. In light of this reasoning, we can no longer rely on the portion of Vanoli that suggests independent intent from multiple successive transactions that are close in time.[2] We recognize a factual distinction between Porter and the present case: Porter involved two transactions with one recipient, id., while here there was one transaction with two recipients. But, the fact that Lawson successively placed money into two separate hands does not change his single criminal intent. Multiple recipients did not give rise to different criminal intent where Lawson's criminal act was the same.

As in Porter, Lawson committed the same crime against the same victim over a short period of time. We reverse the trial court's finding that Lawson's two trafficking offenses constituted separate criminal conduct.

## III. Ineffective Assistance of Counsel

Lawson asserts that his trial counsel was ineffective for failing to argue that his convictions for possession of heroin and possession of methamphetamine constituted the same criminal conduct. But, as the State observes, the trial court did not count the two convictions separately when calculating his offender score.

When a defendant is sentenced for more than one crime, the offender score for any one of those crimes is the sum of two numbers: a score for prior convictions and a score for the other convictions that are currently before the sentencing court. State v. Jones, 110 Wn.2d 74, 75, 750 P.2d 620 (1988); RCW 9.94A.589(1)(a).

---

[2] However, we note that the result in Vanoli was correct. Under the age enhancement statute, each minor buyer was a separate victim. Id. at 651-52. Therefore, Vanoli's crimes did not meet the test for same criminal conduct. Id. at 652.

The trial court calculated Lawson's offender score as seven. Lawson had two prior convictions. This added two points to his offender score. Lawson committed his current offense while on community custody. This added one point to his offender score. Accordingly, Lawson's six current crimes contributed only four points to his offender score of seven. The trial court held that the two trafficking counts constituted separate criminal conduct, meaning that each contributed one point to his offender score. Because only two points remain for four crimes, Lawson's possession convictions were not counted separately. Lawson's counsel was thus not ineffective for failing to argue that they constituted the same criminal conduct.

We remand for resentencing.

WE CONCUR: